**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JANE DOE, M.D.[1]<br>c/o Mark S. Zaid, P.C.<br>1250 Connecticut Avenue, N.W.<br>Suite 700<br>Washington, D.C. 20036<br><br>*Plaintiff*,<br><br>v.<br><br>DEPARTMENT OF THE NAVY<br>1200 Navy Pentagon<br>Washington, D.C. 20350-1200<br><br>and<br><br>DEFENSE HEALTH AGENCY<br>7700 Arlington Blvd.<br>Falls Church, Virginia 22042<br><br>and<br><br>DEPARTMENT OF DEFENSE<br>Washington, D.C. 20301<br><br>*Defendants*. | * | Civil Complaint No: 26-3383 |

* * * * * * * * * * * * *

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Jane Doe, M.D., is a distinguished neonatologist who is facing the potential end of her professional career amidst false allegations of misconduct. On October 7-9, 2026, over the objections of counsel, Plaintiff will face a peer review hearing without having been provided necessary and relevant documentation or information that will enable her to substantively defend

[1] Pursuant to Local Civil Rule 5.1(c)(1), Plaintiff's residential address is being filed under seal with the Court in a separate Notice of Filing. Additionally, a Motion to Proceed Pseudonymously, along with a supporting sealed declaration, is also concurrently being filed.

her professional actions. Because the Department of Navy ("Navy"), the Defense Health Agency and the Department of Defense (collectively "Defendants") have failed or declined to provide the requested documentation, it is violating Plaintiff's constitutional due process rights under the Fifth Amendment, as well as under the Administrative Procedure Act, 5 U.S.C. 701 *et seq*.

In order to ensure adequate and timely protection of her rights, Plaintiff requests this Court issue a Temporary Restraining Order/Preliminary Injunction staying the peer review hearing until no earlier than thirty days after she receives the relevant records she requested and to which she is entitled as a matter of regulation and law.

**<u>JURISDICTION AND VENUE</u>**

1. This Court maintains subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's cause of action arises under the United States Constitution, a federal statute and Department of Defense regulations applicable to the Navy.

2. This Court possesses authority to provide relief pursuant to Federal Rules of Civil Procedure 57, *Declaratory Judgment* and 65, *Injunctions and Restraining Orders*; 28 U.S.C. § 2201, *Creation of Remedy* and 28 U.S.C. § 2202, *Further Relief*, and the Court's inherent equitable powers.

3. Venue is appropriate in this district under 28 U.S.C. § 1391(b)(1), (3) and (e)(3).

**<u>PARTIES</u>**

4. Plaintiff Jane Doe, M.D., is a resident and citizen of the United States.

5. Defendant Department of the Navy is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701, and therefore subject to the jurisdiction of this Court. Defendant's officials or employees have rendered and are rendering the decisions adversely impacting Plaintiff.

6. Defendant Defense Health Agency is headquartered in Arlington, Virginia and is an agency of the United States as defined by 5 U.S.C. § 701, and therefore subject to the jurisdiction of this Court. Defendant's officials or employees have rendered and are rendering the decisions adversely impacting Plaintiff.

7. Defendant Department of Defense is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701, and therefore subject to the jurisdiction of this Court. It holds authority over its components Department of Navy and Defense Health Agency, whose officials or employees have rendered and are rendering the decisions adversely impacting Plaintiff.

## FACTUAL BACKGROUND

8. Plaintiff is a minority woman who has been practicing medicine for nearly forty years as a successful neonatologist. She is board certified in pediatrics and has been licensed in eight states. She is also a Certified Professional in Healthcare Quality by the National Association of Healthcare Quality. Her education and training includes a bachelor of science degree in biology, a medical doctor degree, a residency in pediatrics, a fellowship in neonatology, a master of public health degree, a master of business administration degree, and a certification in health informatics from top American universities and teaching hospitals.

9. In June 2025, while practicing at a naval hospital, Plaintiff raised concerns to hospital management about a specific nurse at that hospital. Specifically, she reported that the nurse failed to administer oxygen to an unstable baby, despite being directly ordered to do so by Plaintiff, and also dangerously and inexplicably grabbed Plaintiff's hand mid-procedure during a delicate brachial artery stick on another critically ill newborn. Plaintiff views her expressions of professional concern as protected communications under 10 U.S.C. § 4701.

10. Several hospital staff then retaliated and falsely accused Plaintiff of poor patient care with respect to the same patients who had been under the care of this particular nurse. Without providing Plaintiff a hearing or the opportunity to be heard in any forum, the hospital then summarily suspended Plaintiff's privileges to practice medicine via a Memorandum dated June 12, 2025, which predictably subsequently resulted in the termination of her contract.

11. As a result of the suspension, the Navy's Hospital is required to issue a Quality Assurance Investigation ("QAI") report and provide a copy to Plaintiff for her response. The Defendants retained a physician, who, upon information and belief, failed to conduct a meaningful review of the medical records or was not provided proper access to the relevant records, and "rubber stamped" the allegations asserted by the Hospital. This process was delayed upon request of the Hospital and a copy of the QAI was not provided to Plaintiff until July 28, 2025. In her effort to respond, Plaintiff requested medical backup information, and Defendant's lawyers said on varying occasions that "such records don't exist," the records "cannot be located," the records are "privileged," and/or the "records are not relevant to the charges."

12. Before Plaintiff had any reasonable opportunity to respond to the QAI report, on July 14, 2025, the Hospital reported the disciplinary measure to the National Practitioner Data Bank ("Data Bank")(*https://www.npdb.hrsa.gov/*), which effectively has labeled Plaintiff a "dangerous doctor."

13. Prior to submitting the report to the Data Bank, the Navy failed to give Plaintiff the documentation supporting her suspension, as required by the Defense Health Agency's Procedures Manual Number 6025.13, Clinical Quality Management in the Military Health System; Volume 4: *Credentialing and Privileging* (Aug. 29, 2019)(*https://govtribe.com/file/government-file/ht0011-20-r-0043-hfas-pws-attachment-2e-dha-pm-6025-dot-13-cqm-in-the-*

*mhs-vol-4-credentialing-and-privileging-dot-pdf*)("DHA Manual Vol. 4"). In fact, the Navy has still failed to do so over nine months later.

14. By Memorandum dated October 30, 2025, Plaintiff received a Notice of Proposed Revocation of Clinical Privileges based on three alleged substantiated allegations that she: (1) demonstrated clinical incompetence and failure to meet standard of care in neonatal patient management; (2) demonstrated deficiencies in communication with other healthcare personnel; and (3) violated hospital ordering protocols and demonstrated inability to use the Electronic Medical Record ("EMR") system to order necessary medications and treatments. A fourth allegation that she demonstrated deficiencies in medical record documentation was found to be unsubstantiated.

15. Plaintiff exercised her right under the applicable regulations to appeal the summary suspension to a peer review panel. The hearing has been delayed for months due to Defendants' continuing refusal to provide Plaintiff with necessary and material discovery to which she is entitled as part of her presentation of her defense at the hearing.

16. Nonetheless, that hearing is currently set to begin, over Plaintiff and her counsel's objections, on October 7, 2026. Defendants' actions are in violation of both the Due Process Clause of the Fifth Amendment and applicable federal statutes and regulations.

Procedures for Peer Review Hearing

17. Naval hospitals provide medical services to U.S. servicemembers and dependents. Any naval hospital's privileging authorities must have an effective peer review process, in accord with Department of Defense regulations, to ensure the clinical competency of its doctors. *See* DHA Manual Vol. 4 at 12.

18. A naval hospital's privileging authority may summarily suspend a doctor's privileges based on concerns "regarding suspected misconduct, impairment, incompetence, or any conduct that adversely affects, or could adversely affect, the health or welfare of a patient or staff member." *Id*. at 9. Such a suspension of privileges must be reported by the hospital to the Data Bank within 30 days of the entry of such summary suspension. *See* Defense Health Agency Procedures Manual Number 6025.13, *Clinical Quality Management in the Military Health System*, Volume 3: *Healthcare Risk Management* (Aug. 29, 2019) at 29-30 (*https://govtribe.com/file/government-file/ht0011-20-r-0043-hfas-pws-attachment-2d-dha-pm-6025-dot-13-cqm-in-the-mhs-vol-3-healthcare-risk-management-dot-pdf*).

19. When a naval hospital suspends a doctor's privileges, the doctor may request a peer review hearing of that decision. A peer review hearing assesses "the quality of medical care carried out by a healthcare provider, including any such assessment of professional performance, any patient safety program [] or report, or any other such assessment carried out by a healthcare provider …". DHA Manual Vol. 4 at 9. Usually that hearing takes place prior to the reporting deadline to the Data Bank, because once a report of summary suspension is filed it effectively creates a perception or label of the doctor being incompetent and/or dangerous and irreparably harms a physician's reputation and chances of employment elsewhere.

20. At that peer review hearing, a doctor may present evidence, and call and cross-examine witnesses. To prepare for that hearing, the doctor must receive in advance a copy of a QAI report, which must include "[a]ll relevant documents." If documents are not appended to the QAI report, a complete list of them and their location must be stated, and the documents safeguarded "to ensure their availability during the peer review hearing process." Prior to the hearing, the

doctor "will have access to all information that will be presented at the peer review hearing to include the disclosure of witnesses in the QAI report." *Id.* at 33. That did not occur in this case.

Allegations Against Plaintiff and the Peer Review Hearing Process

21. On January 13, 2026, as a result of the failure of the Defendants to voluntarily provide Plaintiff with the necessary documentation, and in preparation for a scheduled Peer Review Hearing Panel ("PRHP") that was then set for January 21, 2026, pursuant to DHA Procedural Manual 6025.13, Volume 3 (Healthcare Risk Management), Plaintiff submitted a written request for the following records:

> all relevant records, documents, and evidence related to the adverse clinical privileging action process. This includes, but is not limited to: (1) the complete Quality Assurance Investigation (QAI) report, including findings, recommendations, preliminary statements, summaries, analysis per allegation, conclusions (based on preponderance of evidence), action recommendations, and all appended or referenced documents/exhibits (redacted as required under 10 U.S.C. § 1102 to protect witness identities, patient information, and other confidential elements); (2) all relevant medical records, clinical reports, images, and other patient-related documentation pertaining to the incidents or allegations at issue (redacted for patient privacy in accordance with the Privacy Act and HIPAA); (3) the Credentials Committee/Function's written recommendation memorandum; (4) the Privileging Authority's proposed decision memorandum, including the basis for the proposed action, rationale for any deviation from committee recommendations, and associated notifications; (5) all witness statements, interviews, contact information, and lists of potential witnesses (redacted as necessary); (6) any legal investigation results, such as law enforcement reports or external reviews, if applicable; (7) Dr. Owens-Collins's privileging history, competency assessments, and prior Ongoing Professional Practice Evaluations (OPPE) or Focused Professional Practice Evaluations (FPPE); (8) all evidence, exhibits, or information intended to be presented or relied upon at the peer review hearing, including any pre-hearing disclosures; (9) copies of all notifications provided to Dr. Owens-Collins throughout the process, such as summary suspension notices (if applicable), proposed action notices, and hearing scheduling details; (10) relevant policies, manuals, or procedural guides, including the current versions of DHA-PM 6025.13 (all volumes), DoD Instruction 6025.13, and any Navy-specific instructions (e.g., BUMED instructions) governing adverse privileging actions, peer review hearings, and clinical quality management; and (11) any other documents, records, or data maintained in the Joint Centralized Credentials Quality Assurance

System (JCCQAS) or other systems related to this matter, including status updates and timelines.

Plaintiff's counsel noted that these materials are "essential for adequate preparation and to ensure [Plaintiff's] due process rights under DHA procedures."

22. Defendants repeatedly denied Plaintiff's requests for these documents, despite Department of Defense regulations that say she must be provided with all relevant documents for her defense at the peer review hearing.

23. By e-mail dated January 23, 2026, counsel for the Defense Health Agency stated: "We have provided all medical records, clinical reports, etc. that will be reviewed by the Peer Review Hearing Panel in accordance with DHA-PM 6025.13. Volume 3. Your request for all patient records involving care by your client at the treatment facility is overbroad and overly burdensome for the agency." This despite the fact that Plaintiff requested medical records on only fifteen patients that she treated who would help establish her defense of proper care.

24. On March 25, 2026, Plaintiff's prior counsel sent a letter documenting *four* previous document requests for call schedules, patient records, rosters and safety reports, none of which Defendants provided.

25. By Memorandum dated April 5, 2026, Plaintiff directly requested from the review authorities copies of her (1) Complete Patient Records ("All medical records for patients under my care between February 1, 2025, and June 12, 2025, including patient charts, consultation notes, diagnostic reports, respiratory and nursing flow charts, and imaging studies."); (2) Patient Safety Reports (PSRs)("Full disclosure of the 40 PSRs cited in the suspension decision, along with documentation regarding their reporting, maintenance, and review process."); (3) Call Schedules and Patient Rosters ("A detailed roster of patients I attended to during the specified

period, as the call schedule alone does not provide sufficient information to identify the patients I cared for.")

26. By memorandum dated May 19, 2026, the Director of the Hospital notified Plaintiff "that all responsive records pertaining to the upcoming peer review hearing panel for [Plaintiff] were provided to you on 15 May 2026. No additional records will be produced. Accordingly, all outstanding or subsequent requests for records regarding this matter are hereby denied."

27. By letter dated May 20, 2026, Plaintiff's counsel again sought to obtain a complete record of relevant and necessary documents and requested an array of records to include, but not limited to, "all medical records that could conceivably support or rebut these broad and non-specific claims" the roster of every patient she saw in any capacity, the full chart for any patient where she served as a primary physician, consulting physician, or as a physician who wrote any orders, the 40 Patient Safety Reports ("PSRs"), and any and all "documents that the Quality Assurance Investigative Report of Findings and the Naval Hospital [Location] Credentials Committee relied upon."

28. In response to the Plaintiff's request, on June 18, 2026, the Hospital Director indicated that no additional records would be provided.

29. By e-mail dated July 7, 2026, Plaintiff's counsel, Jolie Apicella ("Ms. Apicella"), who will be handling the PRHP, identified ten specific categories of documents essential to the Plaintiff's preparation for and her defense during the Hearing, including the complete patient roster for the relevant period, complete medical records for all patients Plaintiff treated or evaluated, all Patient Safety Reports referencing Plaintiff, witness information, and all communications reflecting the consideration of Plaintiff's matter by decision-makers throughout the review process. She also sought clarification with respect to "a clear, final written position

from DHA and U.S. Naval Hospital [] regarding the categories of records and information previously requested for the fair hearing … we need these documents to determine what evidence the government intends to present or rely upon, to allow [Plaintiff] to prepare a meaningful defense, and to preserve a fair record for the Peer Review Hearing Panel"

30. In a July 9, 2026 email, Defendant DHA's counsel replied that "[Director of the Hospital's] June 18, 2026 correspondence is the final word and no additional documents or records will be produced."

31. By memorandum dated August 13, 2026, Defendant formally noticed the convening of a PRHP to review the three allegations said to have been substantiated against Plaintiff.

32. By e-mail dated September 14, 2026, Plaintiff's counsel Ms. Apicella notified DHA's counsel that records were still missing that are needed in order to ensure proper due process and fairness. These included, but are not limited to: (1) Ordering Protocols for Allegation 3; (2) various incomplete patient records; (3) failure to receive confirmation of the Hearing exhibits; (4) any supplemental witness statements obtained since the QAI; (5) a list of all the patients seen by Plaintiff; (6) copies of missing PSRs; (7) CVs for each of the witnesses scheduled to appear at the PRHP; and (8) copies of missing Bylaws.

33. Then, despite repeatedly refusing to produce the requested records for eight months, on Thursday, September 24, 2026, at 11:45 PM EDT, less than two weeks from the scheduled Peer Review Hearing, the Defendants suddenly released several hundred pages of additional relevant documentation. This new information will need to be reviewed by the Plaintiff's expert witness, Therefore, by e-mail dated September 25, 2026, Plaintiff's counsel Ms. Apicella requested another adjournment as well as detailed why certain missing information/documentation was still needed. No response has yet been received from the Defendants.

34. Despite Defendants failing to fully respond to counsel's e-mail dated September 14, 2026, as well as continuing efforts over a nine-month period, and over Plaintiff's objections, the PRHP remains scheduled for October 7-9, 2026.

Discovery Materials Still Needed By Plaintiff To Receive A Fair Hearing

35. In order for Plaintiff to receive a full and fair hearing consistent with her due process rights as guaranteed under the U.S. Constitution and applicable Department of Defense regulations, she still needs to receive the following documents. Although Defendants have produced some records—including the QAI Report, patient records for eight of fifteen patients, the Medical Staff Bylaws (USNHGUAMINST 6010.17D), and witness identifications—the following categories of documents have been either denied or remain outstanding despite repeated requests since January 2026:

a. Patient Medical Records (Denied in Part): Regarding Allegations 1 and 3 (clinical incompetence and violation of ordering protocols), Defendants have only produced records for eight of the fifteen patients Plaintiff treated during the relevant period. Defendants denied production of the remaining seven patients' records as "overbroad" and "outside the relevant scope of review." The records of all fifteen patients are necessary to demonstrate that Plaintiff's clinical practices were consistent throughout her tenure;

b. Patient Safety Reports (Denied): Plaintiff requires production of the four PSRs confirmed in a Stipulation of Fact provided by the Defendants to have been submitted regarding Plaintiff's patients during her tenure at the Naval Hospital. Defendants have denied production, claiming the PSRs are "protected, privileged Medical Quality Assurance records under 10 U.S.C. § 1102" and that "PSRs played no role in supporting the adverse action." Plaintiff's supervisor, however, verbally referenced the existence of up to forty PSRs when he related his decision to revoke her privileges. Plaintiff requires the four PSRs to verify compliance with the Stipulation of Fact and to evaluate whether any other PSR content may have indirectly influenced witness accounts or the investigation;

c. Internal Communications (Outstanding): Plaintiff requires all communications reflecting the consideration of the suspension of her privileges by decision-makers throughout the peer review process. These documents have not been produced;

d. Witness Curricula Vitae (Denied): Plaintiff requires advance copies of the curricula vitae of the witnesses Defendants plan to call against her. Defendants denied this request stating "[t]he Government does not maintain custody or control of current personal CVs for all listed witnesses, nor is it required to generate or obtain them for discovery." Plaintiff requires this information to evaluate the qualifications, potential bias, and credibility of the witnesses;

e. Complete Patient Medical Records (Outstanding): For the eight patients whose records were produced, Plaintiff requires confirmation that the records are complete and unredacted, including all physician orders, progress notes, nursing notes, medication administration records (MARs), pharmacy profiles, care plans, consultation records, imaging studies and results, laboratory results including arterial and capillary blood gas values, procedure notes, and discharge and transfer summaries. Plaintiff, her expert and her legal counsel confirmed that critical documentation is missing from the records received, including delivery room records, admission history and physical examination notes, vital signs data, maternal medical and pregnancy history, nursing documentation of interactions with parents and physicians, respiratory therapy notes, and complete laboratory and blood gas results;

f. EMR Audit Trails and Metadata (Outstanding): Plaintiff requires all EMR audit trails, access logs, timestamps, order-entry audit data, metadata, and any system error reports pertaining to the patient encounters at issue. These records have not been produced and are critical to determining whether orders were properly entered, signed within required timeframes, and whether any system issues or training deficiencies—rather than provider misconduct—contributed to the alleged documentation problems underlying Allegation Three;

h. Hospital Policies and Bylaws (Partially Received): Although Defendants produced the Medical Staff Bylaws (USNHGUAMINST 6010.17D), Plaintiff requires all policies governing ordering protocols, medication management, documentation requirements, verbal orders, time-outs, sterile technique, and neonatal resuscitation as in effect during the relevant period (January–June 2025). This includes DHA-PM 6025.13 Volumes 3 and 4, departmental standard operating procedures for neonatology and pharmacy workflows, and EMR training materials;

i. Credentialing and Privileging Records (Outstanding): Plaintiff requires her complete Individual Credentials File (ICF), including all credentialing, privileging, OPPE/FPPE records, and any Performance Appraisal Reports (PARs) generated during her tenure. This includes all documentation related to the Focused Professional Practice Evaluation (FPPE) that was initiated upon her arrival on January 6, 2025;

j. Witness Interview Transcripts (Outstanding): Plaintiff requires complete transcripts, notes, and recordings (if any) of all witness interviews conducted as

part of the QAI, as well as any written witness statements provided to investigators or the Credentials Committee. Due process requires that Plaintiff be permitted to confront the evidence against her, including the statements of witnesses who have reported alleged misconduct;

k. Panel Member Qualifications (Outstanding): Plaintiff requires the curricula vitae (CVs) and professional qualifications documentation for the QAI investigator and the members of the PRHP. Evaluating the reviewers' qualifications and subspecialty expertise is essential to challenge the credibility and reliability of the investigative findings; and,

l. Comparative Data (Outstanding): Plaintiff requires comparative data regarding standard benchmarks for neonatal care outcomes at the Hospital where she worked and comparable facilities, historical data on adverse events, patient safety reports, and peer review actions at the Hospital, and data on the frequency of verbal orders in the NICU. Comparative data is essential to establish what constitutes the community standard in neonatal care and to demonstrate that variations in clinical practice do not constitute incompetence.

36. Defendants' September 25, 2026 production included additional medical records but remains incomplete. For example, Defendants produced incomplete records for only eight of the fifteen patients Plaintiff treated, and denied production of the remaining seven patients' records as "overbroad" and "outside the relevant scope of review." The request for all fifteen patients' records is not burdensome given the serious allegations against Plaintiff, and in light of Defendants' sweeping statements in Allegations 1 and 3 of alleged incompetence and protocol violations. Defendants should not be allowed to pick and choose what documents they provide to Plaintiff.

37. While the QAI identifies specific clinical incidents involving two patients (Patients P and T), the three formal allegations against Plaintiff as stated in the Notice of Proposed Revocation of Clinical Privileges dated October 30, 2025, are framed in broad terms that claim Plaintiff is incompetent. The records from all fifteen patients Plaintiff treated are necessary to refute these charges.

38. These broad assertions, made in response to Plaintiff's complaints about the nursing staff, are not confined to the two patient charts Defendants produced—they speak to Plaintiff's overall clinical competence, communication, and practice patterns throughout her tenure. Plaintiff cannot meaningfully defend against allegations of this breadth without access to the complete universe of patient records reflecting her clinical practice during the relevant period. Complete records from all patients will demonstrate that the practices criticized in the QAI were consistent with the standard of care. The selective production of only certain patient charts creates an incomplete and one-sided evidentiary record, purposefully intended to distort and mislead.

39. The same rationale applies to the four specific PSRs that Defendants have refused to produce. A Stipulation of Fact provided by the Defendants on September 3, 2026, confirms that four PSRs were submitted regarding Plaintiff's patients during her tenure at the hospital, and that the QAIO, Credentials Committee, and Privileging Authority did not review or consider the PSRs when making their recommendations or decisions. Defendants denied production, claiming privilege under 10 U.S.C. § 1102 and asserting that "PSRs played no role in supporting the adverse action." However, as noted, at the time of her suspension, the commanding officer told Plaintiff that forty PSRs actually existed relating to her substandard care and that these were taken into consideration for the decision to suspend her. The discrepancy between the oral representation of forty PSRs and the now-confirmed four PSRs—and Defendants' shifting explanations for non-production—raises significant questions about the evidentiary basis for the suspension. Plaintiff requires access to these four PSRs to verify compliance with the Stipulation of Fact and to evaluate whether PSR content may have indirectly influenced witness accounts or the investigation.

40. Defendants' continued refusal to produce the four PSRs (and any others that might exist)—despite the Stipulation of Fact—significantly prejudices Plaintiff's defense. If the PSRs do not accurately allege misconduct, or if the PSRs are from the one nurse about whom Plaintiff made lawfully protected disclosures, that would be significant to her defense. Furthermore, Plaintiff cannot verify the accuracy of the Stipulation's assertion that the PSRs "played no role" in the decision-making process without reviewing the documents themselves and examining witnesses regarding them.

41. Despite any argument by Defendants to the contrary, the use of patient records in a peer review proceeding is an established and lawful purpose, and the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d, does not prohibit disclosure of records for bona fide quality assurance and credentialing proceedings. Furthermore, 10 U.S.C. § 1102, *Confidentiality of medical quality assurance records*, specifically provides for the use of such records in an administrative proceeding commenced by a former Department of Defense health care provider concerning the suspension of her clinical privileges. *See id*. at (c)(1)(B).

42**.** Additionally, Plaintiff is entitled to see the curricula vitae and professional qualifications of each voting member of the PRHP. The PRHP Appointment Letters designate two of the voting members as clinical "peers" to Plaintiff, but provide no information regarding their clinical specialty training, board certifications, neonatology experience, or current clinical practice. The Defendants have not provided any reason for withholding this information.

43. DHA-PM 6025.13 defines a clinical peer as "one who has similar clinical privileges, clinical specialty, and level of training and experience." The allegations at issue involve complex clinical judgments in neonatal patient management—including vasopressor use, oxygen management, ventilator protocols, and TPN ordering—that fall squarely within the neonatology

subspecialty. Without access to the panel members' qualifications, Plaintiff lacks the ability to verify that the individuals designated as her "peers" in fact possess comparable neonatology training and subspecialty experience, or to raise a challenge to the composition of the panel if they do not.

44. Both the HCQIA, 42 U.S.C. § 11112(b)(3), and DHA-PM 6025.13 require that the hearing be conducted before a panel that includes peers with relevant clinical expertise. Transparency regarding the panel's qualifications is fundamental to the fairness and legitimacy of this proceeding. Plaintiff is entitled to know the qualifications of, and be given the opportunity to object to, the panel members if they are not properly qualified.

45. Without the relevant and necessary records that Plaintiff has requested on multiple occasions she will be unable to sufficiently prepare for or adequately defend herself during the PRHP, which violates numerous applicable regulations and will constitute a violation of her constitutional due process rights.

Plaintiff Needs Time to Review Discovery Materials Produced During the Evening on September 24, 2026

46. Plaintiff and her expert witnesses cannot meaningfully review the voluminous new records she received on September 25, 2026, and the records that this Court orders be produced, before the currently scheduled hearing on October 7, 2026. Denying Plaintiff and her experts sufficient time to study these records in advance of the hearing is a further violation of her due process rights and the Administrative Procedures Act.

47. The records that were just disclosed constitute core clinical records that bear directly on the allegations against Plaintiff regarding her neonatal care practices, including her management of oxygenation, ventilation, and patient monitoring. To illustrate the scope of what is involved, the medical record provided for Patient M.T. alone—one of only two patients whose care forms

the basis of the QAI—is 619 pages. This is a single patient chart that requires detailed, page-by-page expert analysis of clinical decision-making, medication orders, ventilator management, and nursing documentation.

48. Plaintiff will not have an adequate opportunity to review these records before the scheduled hearing. Moreover, Plaintiff's expert witness works full time and must have a meaningful opportunity to review these newly produced records, integrate them with the previously produced materials, and to prepare testimony that speaks to the clinical standard of care. No competent medical expert can fairly review what appears to be a substantial volume of additional clinical documentation — including flow sheets, respiratory therapy records, and imaging — on top of records already produced that include individual patient charts running to hundreds of pages, in the short number of days remaining before the hearing.

49. Forcing Plaintiff to proceed to a hearing without her expert(s) having reviewed the complete medical record would deprive her of a fair and meaningful hearing, in violation of both DHA-PM 6025.13 and the Health Care Quality Improvement Act, 45 C.F.R. Part 60. Given the extended delay to date, necessitated by the failure of Defendants to provide basis and necessary medical data to Plaintiff, an additional short delay to allow time to prepare is reasonable.

50. As previously noted, Defendants' prior position, as articulated by the Hospital Director's e-mail dated May 19, 2026, was that "all responsive records pertaining to the upcoming peer review hearing panel for [Plaintiff] were provided … on 15 May 2026" and that "no additional records will be produced." But the production of hundreds of pages of records days ago contradicts that representation. Plaintiff should not be prejudiced by the Defendants' belated acknowledgment that the record was incomplete.

Plaintiff Still Needs to Interview Government Witnesses

51. The Defendants have identified twelve witnesses they intend to call at the hearing. Under DHA-PM 6025.13, Volume 3, Enclosure 3, Plaintiff has the right to contact and speak to witnesses in advance of the hearing, and to cross-examine such witnesses at the PRHP. The witness notification letters specifically state that counsel "may contact you and wish to speak with you in advance of this hearing about your projected testimony."

52. Despite this clear right, Plaintiff's repeated requests to arrange pre-hearing interviews with Defendants' witnesses remain unanswered. It is Plaintiff's understanding that she may not independently contact these witnesses and must do so only through the Navy. On September 22, 2026, Plaintiff's counsel Ms. Apicella contacted the previously designated hospital representative for facilitating out-of-hearing witness contact to request interviews with all of the witnesses. After failing to receive a response, Ms. Apicella followed up on September 24, 2026, with that individual's successor and again requested permission to contact the named witnesses. No response has been received as to whether and how she may contact any of Defendants' twelve witnesses—much less interview a single witness. With just days remaining before the PRHP, this failure on the part of the Defendants further compounds the constitutional due process violations that are being imposed upon Plaintiff.

53. Plaintiff cannot meaningfully prepare for cross-examination without the opportunity to speak with these witnesses in advance: a right expressly provided to her. This is particularly critical given that Defendants also refuse to produce their witnesses' curricula vitae and professional qualifications, which would assist in Plaintiff's assessment of the qualifications and potential biases of those who will testify against her. The combination of withheld qualifications

and no access to pre-hearing interviews renders effective cross-examination impossible within the remaining time before the PRHP on October 7, 2026.

**COUNT ONE**
**Violation of the Fifth Amendment (Procedural Due Process)**

54. Plaintiff repeats and realleges the allegations contained in paragraphs 8 through 53 above, inclusive.

55. In refusing to repeatedly produce requested documents in advance of Plaintiff's peer review hearing, Defendant is denying Plaintiff a meaningful opportunity to address the allegation, present evidence and witnesses upon her behalf, as well as thoroughly cross-examine government witnesses.

56. Defendant's actions are denying Plaintiff her procedural rights under the Due Process Clause of the Fifth Amendment of the U.S. Constitution. Plaintiff maintains a protected interest in her good name and reputation that cannot be infringed upon without due process of law.

57. If Defendant is permitted to proceed with Plaintiff's peer review board hearing on October 7, 2026, without giving her meaningful opportunity to defend herself in reliance on all relevant documents, the Board's result may cause further violations of Plaintiff's rights.

58. Plaintiff and her expert witnesses cannot meaningfully review the voluminous new records she only just received on September 25, 2026, which is just days before the scheduled hearing on October 7, 2026.

59. Defendants' refusal to facilitate interviews with its twelve identified witnesses denies Plaintiff the opportunity to meaningfully prepare to cross-examine them at the upcoming hearing.

60. Denying Plaintiff and her experts sufficient time to study medical records and interview Defendants' witnesses in advance of the hearing is a further violation of her due process rights.

61. As a result of Defendant's actions, Plaintiff suffered and continues to suffer irreparable harm.

**COUNT TWO**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706**

62. Plaintiff repeats and realleges the allegations contained in paragraphs 8 through 53 above, inclusive.

63. An agency action is "arbitrary and capricious" if for example the agency fails to consider an important aspect of the problem to be addressed at an administrative hearing below. Courts must ensure that the process by which an agency reaches its hearing result is rational.

64. Defendants' refusal to provide Plaintiff material documents for her peer review hearing will likely lead the panel to fail to consider important evidence relevant to her defense and may then lead to an irrational result.

65. Allowing the Defendants to proceed to the PRHP on October 7, 2026, without producing to Plaintiff the documents requested would be unlawfully arbitrary and capricious, and in violation of the Administrative Procedure Act.

66. Plaintiff and her expert witnesses cannot meaningfully review the voluminous new records she only just received on September 25, 2026, which is just days before the scheduled hearing on October 7, 2026.

67. Defendants' refusal to facilitate interviews with its twelve identified witnesses denies Plaintiff the opportunity to meaningfully prepare to cross-examine them at the upcoming hearing.

68. Denying Plaintiff and her experts sufficient time to study medical records and interview Defendants' witnesses in advance of the hearing is a further violation of the Administrative Procedure Act.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A. Immediately issue a Temporary Restraining Order, followed by a Preliminary Injunction, to enjoin Defendants from proceeding with the peer review hearing scheduled to commence on October 7, 2026.

B. Declare that denying Plaintiff the requested records violates her Fifth Amendment due process rights and the Administrative Procedure Act.

C. Order Defendants to immediately provide Plaintiff copies of the documentation requested set forth above at ¶35;

D. Declare that denying Plaintiff and her expert witnesses the opportunity to meaningfully review voluminous new medical records received on September 25, 2026, just days before the currently scheduled hearing on October 7, 2026, also violates her Fifth Amendment due process rights and the Administrative Procedure Act.

E. Preliminarily and permanently enjoin Defendants from proceeding with the peer review hearing until at least thirty days after Plaintiff receives all requested documentation;

F. Award Plaintiff costs and reasonable attorneys' fees under the Equal Access to Justice Act or any other applicable law; and,

G. Grant such other relief as the Court may deem just and proper.

Dated: September 28, 2026

Respectfully submitted,

*s/ Kevin Thomas Carroll*
Kevin Thomas Carroll
D.C. Bar #1021479
Mark S. Zaid
D.C. Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(718) 791-5761
Kevin@MarkZaid.com
Mark@MarkZaid.com

*Attorneys for Jane Doe, M.D.*